IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MEDFORD DIVISION

| | |
|---|---|
| CHRISTOPH K. LaDUE and SHELLEY J. LaDUE, co-administrators of the ESTATE of CHRISTOPH KARL LaDUE, JR., | No. 1:14-cv-01421-CL<br><br>REPORT & RECOMMENDATION |
| Plaintiffs, | |
| v. | |
| CITY OF TALENT et al., | |
| Defendants. | |

CLARKE, Magistrate Judge.

This matter comes before the Court on defendant Lindsey Nichole Painter's ("Painter") motion for summary judgment (#214). For the reasons stated below, the Court recommends Painter's motion be DENIED.

## BACKGROUND

Christoph Karl LaDue, Jr. (the "decedent"), died on September 5, 2012, after allegedly ingesting Bizarro incense. The decedent was twenty-three years old and suffered from schizophrenia. Because he felt the drug reduced his symptoms, the decedent occasionally smoked marijuana. On the afternoon of September 5, intent on purchasing some "herbal stuff to smoke," the decedent visited Sky High Smoke N' Accessories, LLC ("Sky High"), a smoke shop located in Medford, Oregon. Collins Decl. ¶ 2. Upon entering Sky High, Pierce Collins ("Collins"), the decedent's acquaintance, states he heard the decedent engage in a conversation with the storekeeper, whom Collins described as a tan, brown-haired woman with gold highlights. Collins says he heard the decedent ask "for some herbal stuff to smoke" and subsequently observed the storekeeper hand the decedent a black Ziploc bag containing a free sample of something the storekeeper apparently referred to as "aromatherapy"; however, according to Collins, it was difficult to see what the bag contained due to its dark color. Collins Decl. Ex. 1, at 12-13. It was later determined that the bag's substance, an incense, looked like a "green vegetable material," and was sold under the brand name Bizarro. Park Decl. Ex 1, at 21. Collins does not recall the storekeeper stating the bag's contents could be smoked.

After receiving the free sample, the decedent and Collins left Sky High and returned to the decedent's parents' residence in Talent, Oregon. Later that evening, the decedent apparently smoked the Bizarro incense and began exhibiting "bizarre" and "erratic" behavior; the decedent also turned "assaultive" towards his father. Park Decl. Ex. 1, at 9. While the decedent's family attempted to subdue him, the decedent's mother learned that her son had smoked an unknown quantity of the substance he had purchased from Sky High earlier that day. Accordingly, the decedent's grandmother, who was also on the scene, dialed 9-1-1 to report an overdose.

Emergency services were dispatched to the residence. Shortly thereafter, the dispatch received a second 9-1-1 call notifying them that the decedent "had run off." Park Decl. Ex 1, at 17.

Officer David Plummer of the Talent Police Department arrived on the scene roughly five minutes later, and located the decedent, who was walking northbound on a nearby road. Officer Plummer called out to the decedent, saying he simply wanted to "visit with [him]." Park Decl. Ex 1, at 17. The decedent responded, stating he did not want anyone to touch him and to "[s]tay away." Park Decl. Ex 1, at 17. During this time, the decedent entered a driveway of a nearby homeowner, and a second officer, Officer Adam Lewis, simultaneously arrived to assist Officer Plummer, "who was nearing or in the driveway" that the decedent had entered. Park Decl. Ex 1, at 17.

The decedent attempted to enter the neighbor's home, but the homeowner prevented the decedent's entry. Believing that the decedent would enter the residence, "Officer Plummer deployed his Taser" and told the decedent to "get to the ground." Park Decl. Ex 1, at 17. Initially, the decedent complied; however, he quickly attempted to return to his feet. When the decedent attempted to do so, Officer Plummer shot the decedent with his Taser. As he fell to the ground, the Taser's probes were dislodged, which stopped the Taser's effect. The decedent then returned to his feet, removed the probes from his chest, and "began moving toward the roadway." Park Decl. Ex 1, at 18. Consequently, Officer Lewis "fired his Taser" at the decedent, striking him in the back, which caused the decedent "to pause but not stop." Park Decl. Ex 1, at 18. As such, Officer Plummer discharged his Taser for a second time, also striking the decedent in the back, and this time bringing the decedent to the ground. The officers thereafter called for emergency medical assistance.

While the exact sequence of events is unclear, within minutes thereof, a third officer, Steven Scow, arrived at the scene, finding Officers Plummer and Lewis engaged "in a physical fight with [the decedent] in the roadway." Park Decl. Ex 1, at 18. Officer Scow then deployed his Taser, which apparently had "little to no effect." Park Decl. Ex 1, at 18. Consequently, Officer Scow "deployed his pepper spray," which, according to the police report, "also had little to no effect." Park Decl. Ex 1, at 18. During this series of events, the decedent "continued to be combative and fight with officers." Park Decl. Ex 1, at 18. Eventually, the officers were able to sufficiently subdue the decedent and properly handcuff him. It was then that Officer Plummer noticed a brown substance "come out of [the decedent's] mouth," prompting Officer Plummer to call for immediate medical assistance from medical personnel who, by then, were on scene. Park Decl. Ex 1, at 18. Medical personnel determined the decedent was not breathing and had no pulse; they began performing CPR and loaded the decedent into an ambulance, where he was transported to the local hospital. The decedent was later pronounced dead; the coroner determined his cause of death to be "sudden cardiac arrhythmia." Park Decl. Ex 1, at 23.

Following the incident, the decedent's family confirmed to police the decedent had ingested an unknown intoxicant that he had acquired from Sky High earlier that afternoon. Officers later discovered and seized the Bizarro incense from the decedent's parents' home. The incense was sent to the Oregon State Police Crime Laboratory for forensic examination. The Crime Laboratory determined that the incense was a possible synthetic cannabinoid; this despite the fact that the Ziploc bags containing the incense were labeled with "a sticker stating the product does not contain the synthetic cannabinoids controlled in Oregon. . . ." Park Decl. Ex 1, at 29. During the ensuing investigation, an officer "made a purchase of the same substance" from Sky High. Park Decl. Ex 1, at 19.

Following the purchase, detectives contacted Painter, a Sky High managing member. Painter indicated to police that she did not recall giving the substance to the decedent, but that the substance, sold under the brand name Bizarro, was an item for sale at Sky High. Painter personally ordered the product from Zencense Incenseworks, LLC ("Zencense").

Apparently, the Ziploc bags containing the incense were labeled with the Bizarro brand name and contained a warning that the product was not for human consumption. However, the Ziploc bag Sky High provided to the decedent did not contain a Bizarro label on it; Painter told police that "the label had been rubbed off because her dog had urinated on the product box and as she cleaned off the packages the label faded and partially separated." Park Decl. Ex 1, at 21. It appears, however, that the warning, stating that the product was not for human consumption, remained on the bag. The officers noted that Sky High appeared to exclusively sell "smoking devices." Park Decl. Ex 1, at 21.

On September 3, 2014, the decedent's parents (the "plaintiffs") brought, *inter alia*, a wrongful death claim against Painter under a products liability theory. The plaintiffs argue Painter personally ordered the Bizarro incense from Zencense, a product whose condition was dangerous beyond the reasonable expectations of an ordinary consumer. Moreover, the plaintiffs contend that Painter knew or should have known that, when smoked, Bizarro is capable of causing "delirium, cardiac toxicity, rapid heart beat [sic] and seizures, and other serious health effects and failed to warn users and consumers, including [the decedent], of the dangers and risks of [the] product." Third Am. Compl ¶ 71.

Painter moves for summary judgment. She argues the plaintiffs fail to raise a genuine issue of material fact as to her culpability under a products liability theory. Specifically, she argues that while she was working on the day the decedent was provided the free Bizarro sample,

and remembers seeing the decedent in the shop, she does "not recall . . . working the counter that day" and was busy "doing administrative work." Painter Decl. ¶ 2. Additionally, she states, "the Bizarro product and the display case were labeled 'not for human consumption' because the incense was not intended to be smoked." Painter Decl. ¶ 2. Finally, Painter contends she did not know that Bizarro could cause serious health effects and had never contemplated the issue because the product was not intended for human consumption and was labeled as such.

The plaintiffs, by contrast, argue a genuine issue of material fact exists as to whether Painter negligently held Bizarro out to the public, and to the decedent specifically, as a "smokeable" product "and whether she was the individual who provided [the decedent] with a free sample." Pls.' Mem. in Opposition to Painter's Mot. for Summ. J., at 3. In addition, the plaintiffs argue that a genuine issue exists as to whether the product was unreasonably dangerous, since the product was packaged like marijuana, largely resembled marijuana, and was sold in a smoke shop exclusively selling smoking-related products.

## STANDARD

Summary judgment shall be granted when the record shows that there is no genuine dispute as to any material of fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). The moving party has the initial burden of showing that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc). The court cannot weigh the evidence or determine the truth but may only determine whether there is a genuine issue of fact. *Playboy Enters., Inc. v. Welles*, 279 F.3d 796, 800 (9th Cir. 2002). An issue of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

When a properly supported motion for summary judgment is made, the burden shifts to the opposing party to set forth specific facts showing that there is a genuine issue for trial. *Id.* at 250. Conclusory allegations, unsupported by factual material, are insufficient to defeat a motion for summary judgment. *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). Instead, the opposing party must, by affidavit or as otherwise provided by Rule 56, designate specific facts which show there is a genuine issue for trial. *Devereaux*, 263 F.3d at 1076. In assessing whether a party has met its burden, the court views the evidence in the light most favorable to the non-moving party. *Allen v. City of Los Angeles*, 66 F.3d 1052, 1056 (9th Cir. 1995).

///

///

///

///

///

///

///

///

///

///

///

///

///

///

## DISCUSSION

### I.  Products Liability

As discussed, the plaintiffs bring a wrongful death claim against Painter based on a theory of products liability. Specifically, they base their claims on strict products liability, breach of warranty, and negligence theories.[1]

In Oregon, a products liability civil action "embraces all theories a plaintiff can claim in an action based on a product defect," including strict liability, breach of warranty, and negligence. *Kambury v. DaimlerChrysler Corp.*, 185 Or. App. 635, 639 (2003). All types of products liability in Oregon are governed by ORS § 30.900 to § 30.920. *Mason v. Mt. St. Joseph, Inc.*, 226 Or. App. 392, 396 (2009). ORS § 30.900 defines a products liability civil action:

> A civil action brought against a manufacturer, distributor, seller or lessor of a product for damages for personal injury . . . arising out of:
> (1) Any design, inspection, testing, manufacturing or other defect in a product;
> (2) Any failure to warn regarding a product; or
> (3) Any failure to properly instruct in the use of a product.

Although not a model of clarity, the gist of the plaintiffs' products liability claims appears to be premised on a failure to adequately warn the decedent of the dangers of the product. Indeed, while the plaintiffs argue that Painter is liable because the product was dangerous to an extent beyond that anticipated by an ordinary consumer looking to smoke the product, they seem to acknowledge that the product was safe if used for its purported purpose as incense. A product, "which is safe for use if [the directions are] followed, is not in defective condition, nor is it unreasonably dangerous," so long as it contains an adequate warning.

---

[1] It is unclear whether the plaintiffs do intend to claim breach of warranty. The operative Third Amended Complaint states that their wrongful death claim is based on strict products liability, warranty, negligence, and an unrelated state racketeering claim, but the plaintiffs fail to plead, in any kind of detail, how Painter, or any other defendant, breach an implied or express warranty owed to the decedent. Nevertheless, as will be discussed, because an Oregon products liability claim encompasses all theories of liability, and because the plaintiffs present evidence of a failure to adequately warn regarding a product, the plaintiffs are entitled to argue any and all theories of products liability they may have.

*Schmeiser v. Trus Joist Corp.*, 273 Or. 120,133 (1975). The plaintiffs also do not dispute that the Bizarro incense contained a warning that the product was not for human consumption; in fact, the warning was present on the product's container. The issue, then, is whether the warning was proper. If the warning was inadequate, Painter could be found liable under a negligence, breach of warranty, or strict liability theory, or any other conceivable products liability theory. *See, e.g., Benjamin v. Wal-Mart Stores, Inc.*, 185 Or. App. 444, 453 (2002) (explaining that a person may bring a civil action against seller or manufacturer of a product for personal injury, death, or property damage arising out of a failure to adequately warn); *see also Kambury*, 185 Or. App. at 639 (stating that a products liability civil action "embraces all theories a plaintiff can claim in an action based on a product defect," including strict liability, breach of warranty, and negligence). By contrast, if the warning was proper, Painter was entitled to assume that this warning would be read and heeded. *Schmeiser*, 273 Or. at 133. Moreover, because there is no contention that the product was safe for its intended purpose, had an adequate warning existed, the Bizzaro product would neither be considered defective nor unreasonably dangerous, and the fact that the decedent was injured because he failed to heed an adequate warning would not render Painter liable under a negligence, breach of warranty, or strict liability theory. *See id* at 132 (explaining that "[w]here a proper warning is given . . . , the manufacturer or seller is normally not liable on the ground of negligence [or breach of warranty or strict liability] for product-caused injury where the warning or instructions are disregarded").

Oregon courts have explained that a warning is adequate when the warning is:

> [I]n such a form that it could reasonably be expected to catch the attention of the reasonably prudent person in the circumstances of its use and the content of the warning is of such a nature as to be comprehensible to the average user and to convey a fair indication of the *nature and extent of the danger* to the mind of a reasonably prudent person.

*Benjamin*, 185 Or. App. at 454-55 (citing *Anderson v. Klix Chem.*, 256 Or. 199, 207 (1970)) (internal quotations omitted) (emphasis in original). "The adequacy of a warning is ordinarily a jury question." *Id.* at 455. In this case, there is evidence from which a jury could find that the Bizarro incense's warning was inadequate. Indeed, the warning simply stated that the product was not for human consumption; there was no indication as to the nature and extent of the danger that could result from consuming the product. By contrast, it is also possible a jury would find that the warning would have caught the attention of a reasonably prudent person and conveyed the product's principal danger—that it was unsafe if smoked or consumed in any way. Because a warning's adequacy is inherently factual, the Court finds that there is an issue of fact as to whether or not a proper warning existed that would absolve Painter of liability.

Painter argues, however, that summary judgment should nonetheless be granted in her favor because she does "not recall working the counter that day," was busy "doing administrative work," and as such, did not provide the free Bizarro sample to the decedent.[2] Painter Decl. ¶ 2. Whether Painter personally provided the decedent with the Bizarro incense is crucial, as she cannot be liable simply because she is a managing member of Sky High. Indeed, a member or manager of a limited liability company will not be vicariously liable for the company's liabilities, but a member or manager is responsible for "her acts or omissions to the extent those acts or omissions would be actionable against the member or manager if that person were acting in an individual capacity." *Cortez v. Nacco Material Handling Grp., Inc.*, 356 Or. 254, 268-69 (2014) (internal citations omitted). Thus, if Painter did not personally provide the decedent with

---

[2] While it may be argued that no "sale" occurred here because the decedent merely received a free sample, liability does not depend upon whether an actual sale occurred; all that is necessary is that the party charged with liability be in the business of placing the allegedly defective product into the stream of commerce. *See, e.g., Weston v. Camp's Lumber & Bldg. Supply, Inc.*, 205 Or. App. 347, 363 n. 11 (2006) (stating that "a manufacturer, lessor, or seller could be liable for a defect in the quality of goods placed into the stream of commerce"). A free sample is sufficient to meet this liberal standard.

the product, she cannot be held liable. By contrast, if Painter personally provided Bizarro to the decedent, she can be held liable as the individual who provided the decedent with a defective product—*i.e.*, the individual who committed the tort.

While Painter cannot recall working the counter, there exists sufficient evidence in the record to create a genuine issue of fact as to whether Painter in fact provided the product to the decedent. First, Collins, who accompanied the decedent to Sky High, heard the decedent engage in a conversation with the storekeeper, whom Collins described as a tan, brown-haired woman with gold highlights. Collins states he observed the storekeeper hand the decedent a black Ziploc bag containing a free sample As Painter points out, her hair color is described "as blonde or strawberry." Painter's Reply in Supp. of Her Mot. for Summ. J., at 2. Collins' description certainly differs from Painter's actual appearance, but at the summary judgment stage, the Court must view the record in the light most favorable to the plaintiffs and all reasonable inferences must be drawn in their favor, and, here, there is sufficient similarity between Collins' description and Painter's physical appearance to draw an inference that Painter, who admits to working on that day and "notic[ing] [the decedent] in the shop that day," provided the decedent the product. Painter Decl. ¶ 3. This finding is compounded by the fact that Painter personally ordered the Bizarro incense and appears to have had the product in her possession, stating to police officers that her dog urinated on the product.

Consequently, upon viewing the record in the light most favorable to the plaintiffs, a genuine dispute of fact exists as to whether Painter provided Bizarro incense to the decedent. Moreover, assuming Painter did provide the decedent with Bizarro incense, and that the incense did not contain an adequate warning, Painter could be held liable under a products liability

theory, which embraces all theories a plaintiff can claim an action on, including negligence, breach of warranty, and strict liability.[3]

Painter counters, however, arguing she did not know of Bizarro's dangerous propensities and thus was not required to provide a warning. "A seller is required to give warning of a danger when the danger is not generally known and if the seller has knowledge, or by the application of reasonable, developed human skill and foresight should have knowledge, of the presence of the danger." *Benjamin*, 185 Or. App. at 454 (internal quotations and citations omitted). There is evidence suggesting Painter was required to give a warning.

First, Painter acknowledges she was aware the product was not for human consumption. The Court, therefore, thinks that reasonable, developed human skill and foresight should have put Painter on notice that Bizarro incense posed a danger if smoked or ingested in any way. Moreover, an invoice accompanying the Bizarro shipment expressly states that the purchaser understands "[a]ll products manufactured by [Zencense] are not for human consumption" and "that all reasonable precautions will be taken to prevent the misuse of Zencense products," including "refusing to sell to customers (retail or wholesale) who state or imply their intent to misuse the product. . . ." Park Decl. Ex. 1, at 35. Here, the decedent stated to the storekeeper his intent to purchase some "herbal stuff to smoke." Collins Decl. ¶ 2. Assuming, as the Court must on summary judgment, that Painter was the storekeeper who provided the decedent with the Bizarro incense, she was aware of this statement and should have taken measures to prevent misuse, including, at the very least, warning the decedent that the incense must not be ingested.

---

[3] At this stage in litigation, the Court cannot say with certainty that the plaintiffs would be unable to sufficiently allege any of these three theories of liability, and given Oregon's broad language, which allows a plaintiff to assert any and all theories of products liability, the Court believes the plaintiffs are entitled to present evidence on all three theories of products liability.

Painter may argue, however, that this danger was generally known, given the warning on the Ziploc bag, but the Court disagrees. As the police noted, Sky High appeared to exclusively sell "smoking devices," and, indeed, the decedent was looking for something to smoke. Parks Decl. Ex 1, at 21. Accordingly, it does not seem that the dangers the Bizarro incense posed would be commonly known to an ordinary consumer purchasing merchandise at Sky High; thus, Painter, who, the evidence suggests, was aware, or by the application of reasonable, developed human skill and foresight should have been aware, that the product posed a danger if ingested in any way, was required to provide a warning. Therefore, as stated, assuming Painter both provided the decedent with Bizarro incense and that the incense did not contain an adequate warning, both factual questions, Painter could be held liable under a products liability theory for failure to properly warn.

Finally, Painter charges that there is insufficient evidence to suggest the decedent ingested Bizarro incense and not some other intoxicant. In support of this contention, Painter points out that police seized "two 'baggies'" from the decedent's parents' home, the Bizarro incense and "an empty baggie, along with two empty pill bottles." Painter's Reply in Supp. of Her Mot. for Summ. J., at 4. Painter thus argues that this evidence, combined with a lack of any direct evidence that the decedent actually ingested Bizarro incense, points to a finding that the decedent did not in fact smoke Bizarro incense but rather ingested some other substance. While Painter may ultimately be correct, in order to make that determination, the Court would be obligated to weigh her evidence against the plaintiffs', something the court may not do on summary judgment. The issue of whether the decedent did, in fact, ingest Bizarro incense or some other product, like the issue of the adequacy of the warning and whether Painter personally

provided the decedent with the product, is a factual question best decided by a jury. Accordingly, Painter's summary judgment motion should be denied.

## RECOMMENDATION

For the reasons stated above, Painter's motion for summary judgment (#214) should be DENIED.

**This recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals.** Any notice of appeal pursuant to Federal Rule of Appellate Procedure Rule 4(a)(1) should not be filed until entry of the district court's judgment or appealable order.

The Report and Recommendation will be referred to a district judge. **Objections to this Report and Recommendation, if any, are due no later than fourteen days after the date this recommendation is filed. If objections are filed, any response is due within fourteen days after the date the objections are filed.** *See* Fed. R. Civ. P. 72, 6. Parties are advised that the failure to file objections within the specified time may waive the right to appeal the District Court's order. *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

DATED this 17 day of November, 2016.

MARK D. CLARKE
United States Magistrate Judge